IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RICHARD M. JOHNSON,                    )
                                       )
            Plaintiff,                 )
     v.                                )
                                       )
THE MCGRAW-HILL COMPANIES,             )        2:03cv889
MACMILLAN/MCGRAW-HILL,                 )
MCGRAW-HILL SCHOOL DIVISION,           )
SUCCESSORS and ASSIGNS,                )
                                       )
            Defendants.                )

## MEMORANDUM OPINION AND ORDER

Before the Court for disposition are DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT (*Document No. 52*), with brief in support *(Document No. 53)*, Plaintiff's
Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment *(Document
No. 81)*, Defendants' Reply Brief *(Document No. 93)*, PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT *(Document No. 55)*, with brief in support *(Document No. 56)*,
Defendants' Brief in Opposition to Plaintiff's Motion for Partial Summary Judgment *(Document
No. 75)*, and Defendants' Brief in Response to Plaintiff's Motion for Leave to Cite Supplemental
Authority *(Document No. 97)*.  After considering the filings of the parties, the evidence of record
and the relevant statutory and case law, Plaintiff's Motion for Partial Summary Judgment will be
denied and Defendant's Motion for Summary Judgment will be granted in part and denied in
part.

### Background

Plaintiff Richard M. Johnson ("Johnson") was born on February 24, 1944, and is
presently sixty-two years of age.  Defendants' Statement of Undisputed Material Facts in Support
of Motion for Summary Judgment at ¶ 1.[1]  He worked as a sales representative for Defendant

_____

[1]Unless otherwise noted, these facts are not contested by Johnson.  See Plaintiff's
Response to the Defendants' Statement of Undisputed Facts in Support of Motion for Summary

McGraw-Hill Companies ("McGraw-Hill") for a period of thirty-three years, until his employment with the company was terminated on May 19, 2005. *Id.* at ¶¶ 2-3. Throughout most of Johnson's career, his primary sales territory was located in southwestern Pennsylvania. *Id.* at ¶ 25. Alonzo Farr, a fellow sales representative who was born on December 2, 1947, also serviced parts of western Pennsylvania. *Id.* at ¶¶ 26-27. Farr's territory initially consisted of parochial schools in Allegheny, Washington and Greene Counties, and public schools from Butler and Beaver Counties to Erie. *Id.* at ¶ 28. Farr's territory extended as far east as north central Pennsylvania. *Id.* at ¶ 28.

In the early 1990s, Johnson's territory was expanded to include five territories in Ohio, including Akron, Cleveland, Canton, East Liverpool and Youngstown. *Id.* at ¶ 29. Farr's territory was expanded to include all schools located in the southeastern portion of Ohio. *Id.* at ¶ 30. As of 2000, both of these territories were a part of the Great Lakes region, which also included the rest of Ohio, Michigan, Illinois and Indiana. *Id.* at ¶ 37. The region was under the direction of Great Lakes Regional Vice-President Robert Wakeham. *Id.* at ¶ 38. Wakeham was born on January 26, 1946, and is currently sixty years old. *Id.* at ¶ 39.

In 2001, McGraw-Hill promoted Wakeham to the position of National Sales Manager, Open Territory. *Id.* at ¶ 42. On March 14, 2001, McGraw-Hill announced that the former Central and Great Lakes sales regions had been reorganized into a new Midwest region. *Id.* at ¶ 43. Kathy Nauman was named as the Midwest Regional Vice-President, and Yancy Toney was the District Manager for Ohio. *Id.* at ¶¶ 45-46. Western Pennsylvania was included within the Midwest region, while Eastern Pennsylvania was included within the East region. *Id.* at ¶ 47. In June, 2001, McGraw-Hill decided to place Pennsylvania entirely within the East region, leaving Ohio in the Midwest region. *Id.* at ¶ 48. Wakeham had discussions with Nauman and Toney about the 2001 realignment. *Id.* at ¶ 50. After the completion of the 2001 realignment, Farr was responsible for Western Pennsylvania and Johnson was responsible for the Northeast Ohio territory, which included sixteen Ohio counties. *Id.* at ¶¶ 56-57. Johnson was no longer responsible for any part of Pennsylvania. *Id.* at ¶¶ 57-58.

---

Judgment.

Johnson was unhappy with the realignment, and he sought the advice of legal counsel in August, 2001. *Id.* at ¶ 61. He would have preferred either the Western Pennsylvania territory given to Farr or the combined Western Pennsylvania and Ohio territory that he had serviced prior to the realignment. *Id.* at ¶¶ 62-63. He negotiated a $5,000.00 signing bonus when he began to work in his new Ohio territory, which was noted in a memorandum from Wakeham dated August 17, 2001. *Id.* at ¶ 66. When Johnson signed and returned the memorandum, however, he attached a letter to Wakeham indicating that he would need "reasonable accommodations" concerning "the driving and lifting demands of the job," given his "physical limitations." *Id.* at ¶ 68.

At the time of the 2001 realignment, McGraw-Hill employed seventy-nine sales representatives in the United States. *Id.* at ¶ 81. Of those seventy-nine representatives, forty-seven were male and sixty-six were over the age of forty. *Id.* at ¶ 81. Of the sixty-six sales representatives over the age of forty, fourteen were older than Johnson. *Id.* at ¶ 81.

From January to July, 2002, Johnson was on short-term disability leave, which was necessitated by surgery that he had on his neck. *Id.* at ¶ 123. In April, 2002, Johnson sought treatment from Dr. Robert Ackerman. *Id.* at ¶ 124. In July, 2002, Dr. Ackerman cleared him to return to work without restrictions. *Id.* at ¶ 125.

In 2001, McGraw-Hill acquired Benziger and its sectarian school products. *Id.* at ¶ 94. Prior to this acquisition, Johnson and his fellow Ohio sales representatives sold textbooks to Catholic schools. *Id.* at ¶ 96. In 2002, Wakeham decided that former Benziger representative Robert Temme would be responsible for selling both secular and sectarian school products to all Catholic schools in the State of Ohio. *Id.* at ¶ 99. Consequently, Johnson and the other McGraw-Hill Ohio representatives were no longer responsible for those Catholic schools. *Id.* at ¶ 100. Before the Benziger acquisition, Farr sold secular textbooks to Catholic schools in Pittsburgh. *Id.* at ¶ 101. After the acquisition, that responsibility was taken from Farr and given to former Benziger representative Clem DeFrancesco. *Id.* at ¶ 102. After Temme's employment with McGraw-Hill ended in 2003, Wakeham returned responsibility for the Ohio Catholic schools to the Ohio sales representatives, including Johnson, who then sold both secular and sectarian products to those schools. *Id.* at ¶ 103.

During the period of time in which Johnson was not responsible for sectarian schools in Ohio, all of McGraw-Hill's representatives in Ohio were male and all of its representatives in Indiana were female. Plaintiff's Response to the Defendants' Statement of Undisputed Material Facts in Support of Motion for Summary Judgment at ¶ 104. Ohio was an "open territory," as were Pennsylvania, Michigan and Illinois. Defendants' Statement of Undisputed Material Facts in Support of Motion for Summary Judgment at ¶ 107. In each of the open territories, textbook purchase decisions were made separately by each of the counties and districts therein. *Id.* at ¶ 108. Indiana was a "state adoption" territory, in which textbook purchasing decisions were made at the state level and followed uniformly in each of the school districts. *Id.* at ¶¶ 109-110. While Temme was responsible for selling products to the Catholic schools in Ohio, McGraw-Hill's Indiana sales representatives retained the responsibility for selling textbooks to the Catholic schools in Indiana. *Id.* at ¶¶ 104, 111.

On October 30, 2002, Johnson filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). *Id.* at ¶ 115. His counsel mailed the charge to the EEOC on November 1, 2002, and the EEOC acknowledged it as filed on November 5, 2002. *Id.* at ¶ 116. In the charge, Johnson alleged discrimination by McGraw-Hill on the basis of age, gender and disability. *Id.* at ¶ 117. Specifically, he challenged the August, 2001, territory realignment, McGraw-Hill's alleged failure to accommodate his disabilities at the time of the realignment, the temporary removal of Catholic school sales from him and the other Ohio sales representatives in 2002, and his salary. *Id.* at ¶ 118. The EEOC charge was dual-filed with the Pennsylvania Human Relations Commission ("PHRC"). *Id.* at ¶ 119.

By 2004, McGraw-Hill's East region included all of New England, New York, New Jersey, Maryland, Washington, D.C., Pennsylvania and Ohio. *Id.* at ¶ 131. Ed Bonessi was the East Regional Vice-President. *Id.* at ¶¶ 130-131. Bonessi was born on December 30, 1958, and is presently forty-seven years of age. *Id.* at ¶ 132. In July, 2004, McGraw-Hill hired Lyn Klages to be the District Manager of Ohio and Pennsylvania. *Id.* at ¶ 130. Klages was born on April 5, 1950, and is a fifty-six year old female. *Id.* at ¶ 129.

On October 20, 2004, Johnson emailed Bonessi and Klages, informing them that he needed to go on leave because of neck, back and knee problems. *Id.* at ¶ 133. He was suffering

4

from cervical and lumbar disc disease, cervical and lumbar radiculopathy, and degenerative arthritis in the cervical and lumbar areas of his back and knees. *Id.* at ¶ 120. Johnson's leave of absence began on October 21, 2004. *Id.* at ¶ 137. His statutory entitlement to leave under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, expired on January 14, 2005. *Id.* at ¶ 138. On January 21, 2005, Johnson sent Klages an email indicating that he would be able to return to work immediately if certain accommodations were made. *Id.* at ¶ 139. In response to inquiries made by McGraw-Hill, Dr. Ackerman sent Johnson a letter dated March 29, 2005. In that letter, he stated that Johnson was unable to lift more than ten pounds, drive for more than one hour or more than forty miles one way in a given work day, or look at a computer screen for more than a half-hour at a time. (Document No. 61-2, at 34). Dr. Ackerman also stated that Johnson should not engage in pushing, pulling, squatting, kneeling or bending, and that he should not sit or stand for more than one hour without an equal opportunity to walk, stretch, and change positions. *Id.* Given these restrictions, Johnson and McGraw-Hill were unable to agree on a mutually acceptable accommodation. In a letter dated May 18, 2005, Bonessi informed Johnson that his employment with McGraw-Hill was being terminated because of his inability to perform the essential functions of his job. *Id.* at ¶ 202. Johnson's termination was effective on May 19, 2005. *Id.* at ¶ 199.

After exhausting his administrative remedies, Johnson commenced this action against McGraw-Hill on June 13, 2003, alleging violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* After his remedies before the PHRC were fully exhausted, Johnson amended his Complaint on October 9, 2003, to include a previously unavailable claim under the Pennsylvania Human Relations Act ("PHRA"), 43 Pa.C.S. § 931 *et seq.* On July 5, 2005, Johnson filed a Second Amended Complaint to include the circumstances related to his termination. On January 6, 2006, McGraw-Hill filed a Motion for Summary Judgment *(Document No. 52)* and Johnson filed a Motion for Partial Summary Judgment *(Document No. 55)*. This Court has jurisdiction over Johnson's federal claims pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3). This Court also has supplemental jurisdiction over Johnson's claims arising under Pennsylvania law

pursuant to 28 U.S.C. § 1367(a).

Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure reads, in pertinent part, as follows:

"[Summary Judgment] shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

In interpreting Rule 56(c), the United States Supreme Court has stated:

"The plain language . . . mandates entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

An issue of material fact is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must view the facts in a light most favorable to the non-moving party, and the burden of establishing that no genuine issue of material fact exists rests with the movant. *Celotex*, 477 U.S. at 323. The "existence of disputed issues of material fact should be ascertained by resolving all inferences, doubts and issues of credibility against the moving party." *Ely v. Hall's Motor Transit Co.*, 590 F.2d 62, 66 (3d Cir. 1978) (*quoting Smith v. Pittsburgh Gage & Supply Co.*, 464 F.2d 870, 874 (3d Cir. 1972)). Final credibility determinations on material issues cannot be made in the context of a motion for summary judgment, nor can the district court weigh the evidence. *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632 (3d Cir. 1993); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224 (3d Cir. 1993).

When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing' -- that is, pointing out to the District Court -- that there is an absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 325. If

6

the moving party has carried this burden, the burden shifts to the non-moving party, who cannot rest on the allegations of the pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Petruzzi's IGA Supermarkets*, 998 F.2d at 1230. When the non-moving party's evidence in opposition to a properly supported motion for summary judgment is "merely colorable" or "not significantly probative," the court may grant summary judgment. *Anderson*, 477 U.S. at 249-50.

In federal employment discrimination cases, the familiar *McDonnell Douglas*[2] formulation regarding the appropriate burdens of proof and allocation of production of evidence governs and guides the analysis of the evidence presented on a motion for summary judgment. Under *McDonnell Douglas*, the plaintiff must establish a *prima facie* case of discrimination; if this burden is met, the defendant must then articulate some legitimate, nondiscriminatory reason for the employee's treatment. *McDonnell Douglas*, 411 U.S. at 802. If the defendant articulates a legitimate, nondiscriminatory reason for the employee's treatment, then the plaintiff must demonstrate that the defendant's stated reasons were a pretext for unlawful action. *Id.* at 804. The *prima facie* case under *McDonnell Douglas* "is not intended to be onerous." *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995), *cert. denied*, 515 U.S. 1159 (1995). The *prima facie* case raises an inference of discrimination because the courts presume that the challenged acts, if otherwise unexplained, are "more likely than not based on the consideration of impermissible factors." *Id.*

Pennsylvania courts generally interpret the PHRA in accordance with its federal counterparts. *See Kelly v. Drexel Univ.*, 94 F.3d 102, 104 (3d Cir. 1996). The PHRA is to be interpreted "as identical to federal anti-discrimination laws except where there is something specifically different in its language" justifying different treatment. *Fogleman v. Mercy Hospital, Inc.*, 283 F.3d 561, 567 (3d Cir. 2002). Neither party has argued that the PHRA should be

---

[2]*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

interpreted differently from federal law in this case.[3]  Therefore, this Court will interpret the PHRA "as applying identically in this case and governed by the same set of precedents" as the relevant provisions of the applicable federal anti-discrimination statutes.  *Id.*

Discussion

A.      The Timeliness of Johnson's EEOC Charge

McGraw-Hill argues that since Johnson's EEOC charge was filed on November 5, 2002, all claims based on conduct alleged to have occurred prior to January 9, 2002, should be dismissed as time-barred.  Defendants' Brief in Support of Motion for Summary Judgment at 3. Specifically, McGraw-Hill contends that the claims related to the August, 2001, territory realignment, including its alleged failure to accommodate Johnson's disabilities at that time, should be dismissed.  McGraw-Hill also asserts that Johnson's claims regarding his salary are time-barred.  For the reasons hereinafter stated, the Court agrees with McGraw-Hill's argument regarding the 2001 realignment but disagrees with its argument regarding Johnson's salary.

In *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101 (2002), the U.S. Supreme Court explained that "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify."  *Morgan*, 536 U.S. at 114.  The Court went on to say that "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" *Id.* at 114.  Claims based on discrete acts differ meaningfully from claims based on the existence of a hostile work environment.  In the latter category, the alleged violation "occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own."  *Morgan*, 536 U.S. at 115.

*Morgan* involved a claim filed pursuant to Title VII.  Earlier this year, however, the U.S.

_____

[3]The Court acknowledges that, at an earlier stage in this litigation, an issue arose regarding the availability of PHRA remedies against private individuals.  Although the Court acknowledged the possibility that the PHRA differed from the applicable federal anti-discrimination statutes in this regard, the Court's determination that it lacked *in personam* jurisdiction over Robert Wakeham, Anna Mae Stine and Kathleen Nauman essentially mooted the issue.  *(Document No. 27).*  For purposes of the issues now in contention, the parties do not dispute that the PHRA should be construed in the same manner as the relevant federal statutes.

Court of Appeals for the Third Circuit explained that "the distinction between 'continuing violations' and 'discrete acts' is not an artifact of Title VII, but is rather a generic feature of federal employment law." *O'Connor v. City of Newark*, 440 F.3d 125, 128 (3d Cir. 2006). Therefore, "in whatever statutory context the distinction may arise, *Morgan* will control." *Id.* at 128. *Morgan* directly governs this Court's analysis under Title VII, the ADEA and the ADA. Furthermore, the Pennsylvania courts generally construe the PHRA in accordance with its federal counterparts. *Stultz v. Reese Brothers, Inc.*, 835 A.2d 754, 759 (Pa.Super. 2003). Consequently, this Court's analysis under *Morgan* will likewise be dispositive of Johnson's PHRA claims.

The 2001 realignment, which clearly occurred more than three hundred days before Johnson's charge was filed with the EEOC, constituted a discrete act for which Johnson cannot belatedly seek redress. In *O'Connor v. City of Newark*, 440 F.3d 125 (3d Cir. 2006), the Court of Appeals stated that the "non-exhaustive list of discrete acts for which the limitations period runs from the act" consists of the following: termination, failure to promote, denial of transfer, refusal to hire, wrongful suspension, wrongful discipline, denial of training, and wrongful accusation. *O'Connor*, 440 F.3d at 127. McGraw-Hill's decision to reassign Johnson to Ohio, rather than leave him responsible for the portion of Pennsylvania that he preferred, was akin to a "denial of transfer." In one way, it was a forced transfer. In another way, it was a denial of the transfer that Johnson preferred, since the realignment itself, from a structural point of view, made Johnson's retention of his former territory impossible. In either case, the realignment was a discrete act by McGraw-Hill which occurred more than three hundred days before Johnson's EEOC charge was filed. Accordingly, McGraw-Hill's Motion for Summary Judgment *(Document No. 52)* must be granted to the extent that Johnson's claims are based on McGraw-Hill's 2001 realignment.

The Court's determination that the 2001 realignment constituted a discrete act is also dispositive of Johnson's claims related to McGraw-Hill's failure to accommodate his disabilities in August, 2001. In support of his position that his claims are not time-barred, Johnson relies on *Rush v. Scott Specialty Gases, Inc.*, 113 F.3d 476 (3d Cir. 1997), for the proposition that "the continuing violation theory allows a plaintiff [to] pursue a Title VII claim for discriminatory conduct that began prior to the filing period if he can demonstrate that the act is part of an ongoing practice or pattern of discrimination[.]" Plaintiff's Memorandum of Law in Opposition

to Defendants' Motion for Summary Judgment at 19, quoting *Rush*, 113 F.3d at 481.  In *Rush*, however, the Court of Appeals explained that it had adopted the standard established by the U.S. Court of Appeals for the Fifth Circuit in *Berry v. Board of Supervisors of Louisiana State University*, 715 F.2d 971 (5th Cir. 1983), in order to determine whether a given plaintiff was able to demonstrate the existence of a continuing violation.  *Rush*, 113 F.3d at 481-482.  Under that standard, the Court looks first to the subject matter to determine whether the alleged acts involve the same type of discrimination.  *Id.* at 482.  Secondly, the Court looks to the frequency of the acts, and the extent to which they are recurring acts as opposed to isolated work assignments or employment decisions.  *Id.*  Thirdly, the Court looks to the degree of permanence accompanying the alleged action.  *Id.*  Under the third factor, the critical question is whether the act has "the degree of permanence which should trigger an employee's awareness of and duty to assert [his] or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate[.]" *Id.*

It is clear that the 2001 realignment, along with any alleged failure of McGraw-Hill to address the specific requests for accommodation made by Johnson at the time of that realignment, constituted a discrete act within the meaning of *Rush*.  The decision made by McGraw-Hill was a single determination, and it in no way consisted of a pattern of continuing discriminatory activity.  There were no recurring acts by McGraw-Hill, but rather a single act resulting in a permanent realignment.  For this reason, the Court agrees with McGraw-Hill's argument that the merits of Johnson's claims, to the extent that they relate to the 2001 realignment, should not be reached by the Court.  Nevertheless, this determination is limited to the realignment itself and the specific accommodation requests made by Johnson in order to facilitate his ability to service the Ohio territory.  It does not extend to any accommodation requests made by Johnson which were subsequent to, and unrelated to, the realignment itself.

McGraw-Hill also contends that Johnson's claims regarding discriminatory pay are time-barred.  Defendants' Brief in Support of Motion for Summary Judgment at 5-6.  In support of its position, McGraw-Hill relies on *Hicks v. Big Brothers/Big Sisters of America*, 944 F.Supp. 405 (E.D.Pa. 1996).  In *Hicks*, the U.S. District Court for the Eastern District of Pennsylvania lumped

discriminatory pay into a broader category of activity deemed to have "permanence" under the
*Rush* standard. *Hicks*, 944 F.Supp. at 408. Nevertheless, this Court is unpersuaded by McGraw-
Hill's argument on this point. In *Bazemore v. Friday*, 478 U.S. 385 (1986), the U.S. Supreme
Court, through Justice Brennan, declared that "[e]ach week's paycheck that delivers less to a
black than to a similarly situated white is a wrong actionable under Title VII, regardless of the
fact that this pattern was begun prior to the effective date of Title VII." *Bazemore*, 478 U.S. at
395-396, (Brennan, J., concurring in part).[4] In *Morgan*, the Court cited this language in
*Bazemore* with approval. *Morgan*, 536 U.S. at 111-112. When the Court of Appeals discussed
the *Morgan* standard earlier this year in *O'Connor*, it did not include discriminatory pay within
its "non-exhaustive list of discrete acts for which the limitations period runs from the act[.]"
*O'Connor*, 440 F.3d at 127. In various contexts, the U.S. Supreme Court has stated that "if the
precedent of [the Supreme Court] has direct application in a case, yet appears to rest on reasons
rejected in some other line of decisions, the Court of Appeals should follow the case which
directly controls, leaving to [the Supreme Court] the prerogative of overruling its own decisions."
*Tenet v. Doe*, 544 U.S. 1, 10-11 (2005). There is some legitimacy to McGraw-Hill's argument
that the creation of a discriminatory pay structure constitutes a discrete act under *Morgan*. *Inglis
v. Buena Vista University*, 235 F.Supp.2d 1009, 1020-1029 (N.D.Iowa 2002). Nevertheless, in
*Bazemore*, the Supreme Court spoke of each week's discriminatory paycheck as constituting a
distinct violation of Title VII. *Bazemore*, 478 U.S. at 395-396, (Brennan, J., concurring in part).
Therefore, even though the pay structure challenged in this case was allegedly instituted on
October 30, 2000, Johnson's paychecks postdating January 9, 2002, constituted distinct acts by
McGraw-Hill under *Bazemore*. Accordingly, Johnson's claims based on his salary are time-
barred with respect to the period of October 30, 2000, through January 8, 2002, but are not time-
barred with respect to the period of time subsequent to January 9, 2002.[5]

---

[4]This portion of Justice Brennan's opinion was joined by all other members of the Court,
and Justice Brennan was not speaking only for himself when he made the statement quoted
above. *Bazemore*, 478 U.S. at 388.

[5]This determination is inconsequential, given the Court's determination that these claims
lack sufficient merit to survive the summary judgment stage.

B.      Age Discrimination Claims Under the ADEA and the PHRA

In Count I of his Second Amended Complaint, Johnson alleges that McGraw-Hill violated the ADEA by treating younger employees more favorably than him, by having various managers pressure him into retiring, and by keeping his salary classification below the salary classification mean.  Second Amended Complaint at ¶¶ 138-140.  Count IV alleges a distinct violation of the ADEA for retaliation.  *Id.* at ¶¶ 148-149.  These allegations are incorporated within Count VII, which alleges violations of the PHRA.  *Id.* at ¶¶ 155, 157.  In Count VIII, Johnson alleges that he was terminated, in part, because of his age.  *Id.* at ¶ 160.  Count XI alleges a violation of the PHRA for similar reasons.  *Id.* at ¶ 175.

In order to establish a *prima facie* case of age discrimination, a plaintiff is required to establish that: (1) he was a member of a protected class (*i.e.*, that he was at least 40 years old during the relevant period); (2) he was qualified for the position at issue; (3) he suffered an adverse employment action; and (4) he was treated differently than a sufficiently younger and similarly situated person, raising an inference of age discrimination.  *Anderson v. Consolidated Rail Corp.*, 297 F.3d 242, 249 (3d Cir. 2002).

Under the *McDonnell Douglas* burden-shifting framework, Johnson must first establish a *prima facie* case of age discrimination.  If accomplished, the burden then shifts to McGraw-Hill to produce evidence of a legitimate, nondiscriminatory reason for the adverse employment action.  If McGraw-Hill posits such proof, Johnson must then show that McGraw-Hill's proffered legitimate reason(s) are merely a pretext for age discrimination.  *Simpson v. Kay Jewelers Div. of Sterling, Inc.,* 142 F.3d 636, 644 n.5 (3d Cir. 1998).  To show pretext, Johnson must point to some evidence from which a fact finder could reasonably either (1) disbelieve McGraw-Hill's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of his discharge.  *Id.* at 644; *see also Fuentes v. Perski*e, 32 F.3d 759, 764 (3d Cir. 1994).

Johnson has established a *prima facie* case of age discrimination with respect to his contention that his sales quota was higher than that of a younger employee.  Nevertheless, McGraw-Hill has demonstrated that legitimate, nondiscriminatory reasons justified the employment actions which are alleged to have been discriminatory.  In his deposition, Wakeham

testified that employee sales quotas were based on the concepts of "new business" and "residual business." (Document No. 67, pp. 152-153). He explained that "new business" expectations were based on enrollment within a specific territory, and that "residual business" expectations were based on previous adoptions. *Id.* Johnson complains that Joe Rotundo, a younger employee, received a more favorable sales quota. Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment at 23. As McGraw-Hill points out, however, Rotundo was newly hired, had no previous experience in textbook sales, had a lower salary than Johnson, and did not receive commission compensation in 2002 or 2003.[6] Defendants' Statement of Undisputed Material Facts in Support of Motion for Summary Judgment at ¶¶ 90-92. Johnson does not dispute these assertions. Plaintiff's Response to the Defendants' Statement of Undisputed Material Facts in Support of Motion for Summary Judgment at ¶¶ 90-92. Thus, the disparate pay alleged by Johnson did not constitute a violation of the ADEA.

Johnson also alleges that his termination violated the ADEA. He relies on a declaration by Ronald S. Genicola that National Sales Manager Pat Harrigan had expressed a desire "to hire younger sales representatives with some new and fresh ideas." (Document No. 86, Exhibit 84). Nonetheless, when Johnson was terminated, he was replaced by Kerry Kirby, a female in her mid-50's. Defendants' Statement of Undisputed Material Facts in Support of Motion for Summary Judgment at ¶ 212. Consequently, Johnson cannot establish that his age was related to his termination. It is, of course, true that Johnson need not show that he was replaced by a significantly younger individual in order to establish a *prima facie* case of discriminatory discharge under the ADEA. *Roach v. Radio Systems Corporation*, 80 F.Supp.2d 530, 531-532 (W.D.Pa. 1999). In order to surmount this initial hurdle, Johnson need only produce "evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion." *Id.* at 532. Whether he has done so with respect to his claim under the ADEA is debatable. In any event, however, the Court is satisfied that no reasonable fact-finder could conclude that Johnson was terminated due to his age. Giving him the benefit of the doubt

---

[6]One could argue that Johnson has failed to establish a *prima facie* case of age discrimination because he and Rotundo were not similarly situated. Nonetheless, the Court assumes *arguendo* that they were similarly situated.

at the *prima facie* stage, McGraw-Hill has articulated an age-neutral reason for Johnson's termination, namely that he could not perform the essential functions of his job. It remains to be determined whether Johnson's termination constituted a violation of the ADA. Notwithstanding the existence of that issue, the Court is convinced that McGraw-Hill has demonstrated a basis for Johnson's termination irrespective of his age, and that Johnson has not produced enough evidence to allow a reasonable fact-finder to conclude that the reasons given by McGraw-Hill for his termination merely constituted a pretext for age discrimination.

In support of its position, McGraw-Hill points out that, at the time of the realignment in August, 2001, it employed a total of seventy-nine sales representatives nationwide, sixty-six of whom were over the age of forty. Defendants' Statement of Undisputed Material Facts in Support of Motion for Summary Judgment at ¶ 81. Of the sixty-six sales representatives who were over the age of forty, fourteen were older than Johnson. *Id.* As noted earlier, Johnson was replaced by an individual who was not significantly younger than him. Furthermore, it is undisputed that Johnson was paid the highest salary of any sales representative in Ohio and Pennsylvania in 2002 and 2003. *Id.* at ¶ 75. These facts seriously undermine Johnson's contention that his age was an instrumental factor in either the determination of his level of compensation or McGraw-Hill's ultimate decision to terminate him.

In an attempt to survive summary judgment, Johnson relies on some prior decisions of the U.S. Court of Appeals for the Third Circuit in order to buttress his claim that the remarks of people like Harrigan can be used to build a circumstantial case of age discrimination. Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment at 23-24; *Abrams v. Lightolier, Inc.*, 50 F.3d 1204, 1214 (3d Cir. 1995); *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 521 (3d Cir. 1997); *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 333 (3d Cir. 1995); *Lockhart v. Westinghouse Credit Corp.*, 879 F.2d 43, 54 (3d Cir. 1989). These cases, however, do not stand for the proposition that a few stray remarks by individuals in managerial positions can *alone* support a claim under the ADEA. Johnson must show more than that in order to get his claim under the ADEA to the fact-finder. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Anderson v. Liberty Lobby,*

14

*Inc.*, 477 U.S. 242, 252 (1986), (emphasis added).  Johnson has failed to demonstrate that such evidence exists.

Accordingly, the Court must grant McGraw-Hill's Motion for Summary Judgment *(Document No. 52)* with respect to Counts I and VIII.  To the extent that Counts VII and XI are based on allegations of age discrimination, McGraw-Hill's Motion for Summary Judgment must be granted with respect to those counts as well.[7]

C.    <u>Gender Discrimination Under Title VII and the PHRA</u>

Count II of Johnson's Second Amended Complaint alleges that McGraw-Hill violated Title VII by "removing Catholic school book sales from [Johnson] and the two other male sales representatives in Ohio while removing little or no Catholic book sales from the sales representatives in Indiana, all of whom were female[.]" Second Amended Complaint at ¶ 143. Count VI alleges a distinct violation of Title VII for retaliation.  *Id.* at ¶¶ 153-154.  These allegations are incorporated within Count VII, which alleges related violations of the PHRA.[8]  *Id.* at ¶¶ 155, 158.

In order to establish a *prima facie* case of gender discrimination under Title VII, Johnson must establish that: (1) he was a member of a protected class; (2) he was performing his job satisfactorily; (3) he suffered an adverse employment action; and (4) similarly situated employees outside of his protected class were treated more favorably.  *Goodwin v. Board of Trustees of the University of Illinois*, 442 F.3d 611, 617 (7th Cir. 2006); *Grande v. State Farm Mutual Automobile Insurance Co.*, 83 F.Supp.2d 559, 562 (E.D.Pa. 2000).[9]  In the instant case, McGraw-Hill contends that Johnson cannot establish a *prima facie* case of gender discrimination. Defendants' Brief in Support of Motion for Summary Judgment at 13-14.  After a thorough

---

[7]Count IV is addressed in a later portion of the opinion dealing with all of Johnson's counts alleging retaliation.

[8]Johnson does not allege that his gender was a reason for his termination.

[9]In *Jones v. School District of Philadelphia*, 198 F.3d 403 (3d Cir. 1999), the U.S. Court of Appeals for the Third Circuit explained that "the elements of a *prima facie* case depend on the facts of the particular case[,]" and that "a *prima facie* case cannot be established on a one-size-fits-all basis."  *Jones*, 198 F.3d at 411.  The Court is convinced that the elements used in *Goodwin* and *Grande* are the appropriate ones to be applied in this case.

15

review of the evidence presented by both parties, the Court agrees with McGraw-Hill.

At the outset, it is worth noting that the requirement that a plaintiff establish a *prima facie* case under Title VII "is not intended to be onerous." *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995), *cert. denied*, 515 U.S. 1159 (1995). Notwithstanding that reality, Johnson must still establish a *prima facie* case of gender discrimination in order to shift the burden of production to McGraw-Hill. In this case, McGraw-Hill argues that Johnson cannot establish a *prima facie* Title VII case for four reasons. First of all, it was Wakeham, a male, who made the decision to take the Catholic school sales duties away from the Ohio representatives and give them to Temme. Defendants' Brief in Support of Motion for Summary Judgment at 13. Secondly, these duties were assigned to Temme, another male, after being taken away from the Ohio representatives. *Id.* Thirdly, the sales duties were returned to the male Ohio representatives after Temme's employment with McGraw-Hill ceased. *Id.* Fourthly, and finally, McGraw-Hill argues that the female representatives in Indiana were not similarly situated to the male representatives in Ohio. *Id.*

McGraw-Hill asserts, and Johnson does not dispute, that Ohio was an "open territory" and that Indiana was a "state adoption territory." Defendants' Statement of Undisputed Facts in Support of Motion for Summary Judgment at ¶¶ 107, 109. During the relevant portions of 2002 and 2003, textbook purchasing decisions for the Ohio schools were made separately by the individual counties and districts within the state. *Id.* at ¶ 108. In Indiana, textbook purchasing decisions were made at the state level and followed uniformly by the various school districts within the State. *Id.* at ¶ 110. For this reason, the male sales representatives in Ohio and the female sales representatives in Indiana were not similarly situated. It would have made little sense for McGraw-Hill to have taken the responsibility for Catholic school book sales away from its Indiana representatives, since those schools followed the statewide book adoption schedule at least with respect to secular textbooks. Plaintiff's Response to the Defendants' Statement of Undisputed Material Facts in Support of Motion for Summary Judgment at ¶ 111. The undisputed evidence strongly suggests that the textbook purchasing policies in Ohio and Indiana differed to a degree significant enough to justify McGraw-Hill's distinct sales policies for each of the two states. For this reason, the representatives in Ohio were not similarly situated with their

Indiana colleagues, and Johnson has thus failed to establish a *prima facie* case of gender discrimination under Title VII.

Even if Johnson were able to establish a *prima facie* case, he would be unable to refute McGraw-Hill's legitimate, nondiscriminatory reason for treating the Ohio sales representatives differently from those in Indiana. Following McGraw-Hill's acquisition of Benziger, it was faced with a decision as to how to utilize the former Benziger sales representatives. No reasonable fact-finder could conclude that McGraw-Hill's decision to utilize the new representatives more effectively was merely a pretext for gender discrimination. The parties agree that Farr lost the Catholic school book sales in his Pennsylvania territory, and that they were given to DeFrancesco. Defendants' Statement of Undisputed Material Facts in Support of Motion for Summary Judgment at ¶ 102. Pennsylvania was an "open territory" like Ohio, thereby illustrating that McGraw-Hill's adjustments after the Benziger acquisition were fairly consistent. *Id.* at ¶ 107. Furthermore, after Temme's employment with McGraw-Hill was terminated in 2003, Catholic school book sales were returned to the Ohio representatives, one of whom was Johnson. *Id.* at ¶ 103. Under these circumstances, it appears that McGraw-Hill's purpose for assigning these sales responsibilities to Temme was to assure that his services were being used in an effective manner. Whether this action constituted a wise business decision is of no legal significance. Suffice to say that it was not a pretext for invidious gender discrimination.

In an attempt to overcome McGraw-Hill's argument regarding the differences in the Ohio and Indiana sales markets, Johnson argues that such a distinction is negated by the fact that the religious products for Catholic schools were not subject to the statewide adoption schedule. Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment at 21. This, of course, should come as no surprise. Products with a sectarian content are unsuitable for use in a public school. *Mitchell v. Helms*, 530 U.S. 793, 820-829 (2000), (plurality opinion). The fact that the Indiana sales representatives had the unique responsibility of selling religious products to Indiana's Catholic schools does not change the reality that, even in the Catholic schools, the overwhelming majority of the textbooks purchased *were* subject to the uniform adoption schedule. It was not unreasonable for McGraw-Hill to conclude that, given the generally uniform nature of the sales in Indiana, it was better to leave the responsibility for

17

textbook sales to both public and parochial schools in the hands of the same personnel.

Even if the Court were persuaded that McGraw-Hill's decision to leave the female Indiana representatives responsible for textbook sales to Catholic schools was somehow imprudent, Johnson could not prevail on his Title VII claim. In order to discredit McGraw-Hill's reason for the disparate treatment, Johnson "cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer [was] wise, shrewd, prudent, or competent." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994). Johnson has not established a *prima facie* case of gender discrimination. Even if he had done so, however, he would only be able to defeat McGraw-Hill's Motion for Summary Judgment by discrediting its proffered reasons for the disparate treatment, either circumstantially or directly, or by "adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes*, 32 F.3d at 764. Johnson has done neither.

In an attempt to create an inference of gender discrimination, Johnson points to four sources. Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment at 21-22. First, he asserts that women who were hired to work in the sales force were not told that they would need to lift up to fifty pounds in order to do the job. *Id.* at 21. Nevertheless, in an earlier portion of this same brief, Johnson argues that "*no sales representative* has ever been disciplined for not being able to lift 50 pounds, nor has *any* rep been tested to determine if *he or she* actually can lift 50 pounds." *Id.* at 7-8, (emphasis added).[10] Johnson's Title VII argument is, therefore, undercut by his own argument with respect to the ADA. Johnson's own assertion is that males and females were treated equally with respect to the disputed lifting requirement.

Secondly, Johnson claims that male employees were subjected to abuse by females who

---

[10]In support of his claim under the ADA, Johnson argues that the fifty-pound lifting requirement was never an essential function of his job. The fact that female representatives were never told that they had to meet this lifting requirement may bolster Johnson's ADA claim. Nonetheless, his assertion that none of the representatives had been required to meet this standard severely undermines his gender discrimination claim under Title VII.

held supervisory positions. *Id.* at 21-22.  To support this contention, he calls the Court's attention to declarations made by Barbara C. Sawyer and Ronald S. Genicola.  (Document Nos. 69, Exhibit 77, 86, Exhibit 84).  Genicola's declaration says absolutely nothing about gender discrimination.  (Document No. 86, Exhibit 84).  Sawyer's declaration speaks in general terms about the alleged tirades of Ann Stine, who had been Johnson's consultant in the Pittsburgh area before attaining the rank of Vice-President of the Northeast Region.  (Document No. 69, Exhibit 77).  Johnson, however, makes no attempt to link Stine to the 2002 decision to give the Ohio Catholic school sales responsibilities to Temme.

Thirdly, Johnson insinuates that gender animus can be read into two emails written by Klages.  Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment at 22.  The first such email is a September 13, 2004, message sent by Klages to Michael McGlynn, who was McGraw-Hill's Senior Director of Human Resources.  In that message, Klages expressed her frustration with Johnson's refusal to complete a survey that she had asked each sales representative in the district to complete.  (Document No. 58, Exhibit 28).  She stated that he had refused to put anything in writing because of his lawsuit against the company.  *Id.*  While this message may have some relevance with respect to Johnson's retaliation claims, it is difficult to fathom how he believes that it provides a reasonable fact-finder with an inference of gender discrimination.  The message contains no indication of gender animus, and Johnson must do more than show that it was authored by a woman in order to advance his Title VII claim.  The second email relied upon by Johnson is a January 21, 2005, message sent by Klages to McGlynn.  In that message, Klages asked McGlynn whether Johnson's disability insurance would be extended beyond that date and, if not, whether the company would be able to act on his termination.  (Document No. 59, Exhibit 38).  This message, too, contains no indication that Klages was acting on the basis of gender-related animus.

Finally, Johnson claims that McGraw-Hill gave a raise to a female which had not been offered to him.  Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment at 22.  Johnson, however, fails to explain the precise details of this incident, leaving the Court to wonder what relevance it has to his Title VII claim.  McGraw-Hill contends that Johnson was paid a higher salary than the younger female sales representatives in Indiana,

and Johnson does not dispute this contention.  Plaintiff's Response to the Defendants' Statement of Undisputed Material Facts in Support of Motion for Summary Judgment at ¶ 77. Consequently, the Court concludes that Johnson's allegations of unlawful gender discrimination are wholly without merit.

Accordingly, the Court must grant McGraw-Hill's Motion for Summary Judgment *(Document No. 52)* with respect to Count II of Johnson's Second Amended Complaint *(Document No. 45)*, and with respect to Count VII to the extent that it alleges a violation of the PHRA on the basis of gender.

C.    Disability Discrimination Under the ADA and the PHRA

In Count III of his Second Amended Complaint, Johnson alleges that McGraw-Hill violated the ADA by failing to accommodate his disabilities.[11]  Second Amended Complaint at ¶¶ 146-147.  Count V alleges a distinct violation of the ADA for retaliation.  *Id.* at ¶¶ 151-152. These allegations are incorporated within Count VII, which alleges violations of the PHRA.  *Id.* at ¶¶ 155-156.  In Count IX, Johnson alleges that his termination constituted a violation of the ADA.  *Id.* at ¶ 162.  Count X alleges that McGraw-Hill retaliated against Johnson for invoking his rights under the ADA by failing to engage in an interactive process and, ultimately, by terminating his employment.  *Id.* at ¶¶ 164, 166.  These allegations are incorporated within Count XI, which alleges that McGraw-Hill's termination of Johnson's employment constituted a violation of the PHRA.  *Id.* at ¶¶ 174-175.  McGraw-Hill has filed a Motion for Summary Judgment with respect to all counts in the Second Amended Complaint.  *(Document No. 52)*. Johnson has filed a Motion for Summary Judgment with respect to Counts III, VII, IX and XI.

---

[11]Although the *McDonnell Douglas* burden-shifting test can apply to certain ADA claims, it does not apply to all claims under the Act. There are two distinct types of claims under the ADA--disparate treatment (disability discrimination) claims and failure to accommodate claims. In the former type of claim, a plaintiff without direct proof of discrimination may use the *McDonnell Douglas* test to meet his burden indirectly. In the latter type of claim, however, the *McDonnell Douglas* test does not apply.  If a plaintiff alleges facts that, if proven, would show that an employer should have reasonably accommodated an employee's disability but failed to do so, he establishes that the employer has discriminated against him.  There is no need for indirect proof or burden- shifting. *Walton v. Mental Health Ass'n of Southeastern Pa.*, No. Civ. A. 96-5682, 1997 WL 717053, at *10 (E.D.Pa. Nov.17, 1997), *aff'd,* 168 F.3d 661 (3d Cir.1999).

*(Document No. 55)*.

A plaintiff establishes a *prima facie* case of discrimination under the ADA by demonstrating that: (1) he is a "qualified individual with a disability" under the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an adverse employment decision as a result of discrimination. *Gaul v. Lucent Technologies, Inc.*, 134 F.3d 576, 580 (3d Cir. 1998) (*citing Shiring v. Runyon*, 90 F.3d 827, 831 (3d Cir. 1996)). The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 193 (2002).[12]

In order for a plaintiff to establish a *prima facie* failure to accommodate case under the ADA, he must demonstrate that: (1) he had a disability; (2) the employer had notice of this disability; (3) he can perform the essential functions of his position with a reasonable accommodation; and (4) the employer failed to provide a reasonable accommodation. *Conneen v. MBNA America Bank, N.A.*, 182 F.Supp.2d 370, 376-377 (D.Del. 2002); *Rhoads v. F.D.I.C.*, 257 F.3d 373, 387, n. 11 (4th Cir. 2001). The ADA itself does not specifically refer to an interactive process, and "requires only that an employer make a reasonable accommodation to the known physical or mental disability of a qualified individual with a disability unless the employer can show that the accommodation would impose an undue hardship on the employer." *Conneen v. MBNA America Bank, N.A.*, 334 F.3d 318, 329 (3d Cir. 2003). Nevertheless, 29 C.F.R. § 1630.2(o)(3) states as follows: "To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential

---

[12]As discussed earlier, Johnson's claims related to the 2001 realignment were not filed with the EEOC in a timely manner. For this reason, the Court's discussion about Johnson's ADA (and related PHRA) claims is limited to the specific events immediately preceding, and concurrent with, the termination of his employment.

reasonable accommodations that could overcome those limitations." In order for a plaintiff to hold his employer responsible for a breakdown in the interactive process, he must show that: (1) the employer knew about his disability; (2) he requested accommodations or assistance for his disability; (3) the employer did not make a good faith effort to assist him in seeking accommodations; and (4) he could have been reasonably accommodated but for his employer's lack of good faith. *Conneen*, 334 F.3d at 330-331.

In this case, the parties agree that Johnson had a disability and that McGraw-Hill was aware of it.[13] It is also clear that McGraw-Hill's decision to terminate Johnson's employment was made because of this disability. Defendants' Statement of Undisputed Material Facts in Support of Motion for Summary Judgment at ¶ 4. The parties dispute the questions as to whether Johnson remains capable of performing the essential functions of his position in spite of his disability, and whether McGraw-Hill has failed to provide *reasonable* accommodations in order to permit Johnson to continue working as a sales representative. Plaintiff's Response to the Defendants' Statement of Undisputed Material Facts in Support of Motion for Summary Judgment at ¶ 4. To the extent that there was a breakdown in the interactive process, the parties dispute the question of who was to blame for the breakdown. *Id.* at ¶¶ 137-198; Defendants' Statement of Undisputed Material Facts in Support of Motion for Summary Judgment at ¶¶ 137-198.

Earlier this year, the U.S. Court of Appeals for the Third Circuit explained that the question of "whether a particular function is essential is a factual determination that must be made on a case by case basis based upon *all* relevant evidence." *Turner v. Hershey Chocolate*

---

[13]The Court acknowledges that McGraw-Hill contends, in its Brief in Opposition to Plaintiff's Motion for Summary Judgment at 4, n. 4, that Johnson has failed to establish how his impairments compare to the average person in the general population. Nevertheless, McGraw-Hill did not raise this argument in its brief in support of its own Motion for Summary Judgment, opting instead to rely solely on its "essential function" and "interactive process" arguments. Defendants' Brief in Support of Motion for Summary Judgment at 14-23. The Court has determined that Johnson's Motion for Summary Judgment *(Document No. 55)* should be denied in its entirety for other reasons. Therefore, there is no need for the Court to address Defendant's argument, raised for the first time in its Brief in Opposition to Plaintiff's Motion for Summary Judgment, that Plaintiff has failed to establish that he is "disabled" under the ADA.

*USA*, 440 F.3d 604, 612 (3d Cir. 2006) (brackets and internal quotation marks omitted; emphasis in original).  In order for a job duty to be an essential function, it must be "fundamental" to the position held or desired by the employee.  *Id.*  "A job function may be considered essential for any of several reasons, including, but not limited to, the following: (i) The function may be essential because the reason the position exists is to perform that function; (ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or (iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function."  *Id.*; 29 C.F.R. § 1630.2(n)(2).  "Evidence of whether a particular function is essential might include, but is not limited to: (i) The employer's judgment as to which functions are essential; (ii) Written job descriptions prepared before advertising or interviewing applicants for the job; (iii) The amount of time spent on the job performing the function; (iv) The consequences of not requiring the incumbent to perform the function; (v) The terms of a collective bargaining agreement; (vi) The work experience of past incumbents in the job; and/or (vii) The current work experience of incumbents in similar jobs."  *Turner*, 440 F.3d at 612; 29 C.F.R. § 1630.2(n)(3).

In the instant case, McGraw-Hill contends that its sales representatives must be able to drive within an assigned territory, present and attend sales presentations and seminars, lift materials and prepackaged books weighing up to fifty pounds, push and pull prepackaged books, sit, walk, bend, kneel and squat.  Defendants' Brief in Opposition to Plaintiff's Motion for Partial Summary Judgment at 4-5.  Johnson argues that these functions are not essential for purposes of a sales representative position.  Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment at 3-8.  After a thorough review of the evidence presented by the parties, the Court is convinced that genuine issues of material fact remain as to whether the functions described by McGraw-Hill are essential functions of a sales representative position, whether the accommodations proposed by Johnson were "reasonable" within the meaning of the ADA, and whether McGraw-Hill's participation in the interactive process was conducted in good faith.  For this reason, the Court must deny Johnson's Motion for Partial Summary Judgment in its entirety and McGraw-Hill's Motion for Summary Judgment with respect to the specific counts at issue.

In support of its position that the functions noted earlier are essential functions of a sales representative's job, McGraw-Hill directs the Court to the testimony of Klages, Wakeham and Bonessi. Klages testified that sales representatives typically had to lift boxes weighing between forty-five and fifty pounds, and that they sometimes had to spend four to six hours driving in a single day. (Document No. 65, Exhibit 71, at 42-43). In a later deposition, she testified that boxes would have to be lifted on roughly four days in a five-day week. *Id.* at 10. Wakeham testified that he had often told prospective employees that they would be required to lift boxes weighing between forty and fifty pounds. (Document No. 67, Exhibit 73, at 100-101). In addition, Bonessi testified that the job required physical exertion in a manner consistent with these descriptions. (Document No. 62, Exhibit 67, at 42). While an employer's judgment as to which functions of a job are essential is not dispositive of the issue, it is a factor entitled to weight in the making of such a determination. 29 C.F.R. § 1630.2(n)(3).

Johnson argues that squatting, kneeling, bending, walking, sitting, pushing and pulling materials and prepackaged books, lifting materials and prepackaged books weighing up to fifty pounds, and driving within an assigned territory are not essential functions of a sales representative position. Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment at 4. He concedes that presenting and attending sales presentations and seminars is an essential function. *Id.* In support of his position, he calls the Court's attention to the expert report of Celia P. Evans. In her report, she identified fourteen functions which she found to be essential to a sales representative position such as the one previously held by Johnson.[14] (Document No. 69, Exhibit 78, at 16-17). None of those functions included the

---

[14]Ms. Evans indicated that, in order to perform the essential functions of a sales representative position, an employee must be able to do as follows: (1) answer customers' questions about products, prices, availability, product uses, and credit terms; (2) arrange and direct delivery and installation of products and equipment; (3) contact regular and prospective customers to demonstrate products, explain product features, and solicit orders; (4) estimate or quote prices, credit or contract terms, warranties, and delivery dates; (5) forward orders to manufacturers; (6) identify prospective customers by using business directories, following leads from existing clients, participating in organizations and clubs, and attending trade shows and conferences; (7) monitor market conditions, product innovations, and competitor's products, prices, and sales; (8) negotiate details of contracts and payments, and prepare sales contracts and order forms; (9) prepare drawings, estimates, and/or bids that meet specific customer needs; (10)

physically demanding tasks described by McGraw-Hill as essential. The fact that the functions alleged by McGraw-Hill to be essential to a sales representative's job do not appear in the Department of Labor's Dictionary of Occupational Titles bolsters Johnson's argument to some degree. *Deane v. Pocono Medical Center*, 142 F.3d 138, 147-150 (3d Cir. 1998). Ms. Evans expressed the view that Johnson was "a qualified individual with a disability" under the ADA. *Id.* at 21.

Johnson adds further support to his argument with the depositions of Ronnie Felder and Margaret Wojton. In his first deposition, Felder, a human resources representative, testified that he was never told that he could not hire a sales representative who needed to use a wheelchair. (Document No. 63, Exhibit 69, at 73). He further testified that he saw no reason why a person in a wheelchair could not be hired as a sales representative. *Id.* In his second deposition, Felder testified that he had no specific recollection surrounding the question of why the fifty-pound lifting requirement was added to a sales representative job posting. (Document No. 63-2, Exhibit 69, at 159-163). When Wojton was deposed, she testified that nobody had told her that she would have to lift fifty-pound boxes in order to work as a sales representative. (Document No. 68, Exhibit 74, at 32-33). She indicated that she was unable to do much of the lifting herself, and that she had often relied on consultants and school janitors to help her. *Id.*

Finally, Johnson relies on declarations made by individuals familiar with the tasks commonly performed by sales representatives. Barbara Sawyer, a Catholic school principal who once worked as an educational consultant for McGraw-Hill, stated that a successful sales representative "can make a presentation to potential customers armed only with a pupil edition and teacher edition of any subject textbook the district is reviewing." (Document No. 69, Exhibit 77, at 6). Ronald Genicola, a sales representative himself, stated that, in the past, some representatives had made written requests for book samples to be shipped directly to the

---

provide customers with product samples and catalogs; (11) recommend products to customers, based on customers' needs and interests; (12) check stock levels and reorder merchandise as necessary; (13) consult with clients after sales or contract signings in order to resolve problems and provide ongoing support; and (14) perform administrative duties, such as preparing sales budgets and reports, keeping sales records, and filing expense account reports. (Document No. 69, Exhibit 78, at 16-17).

requesting school.  (Document No. 69, Exhibit 76).  He made it clear that this was done "on a regular basis."  *Id.*  Perhaps the most comprehensive assessment of this factual issue was made by Richard Freidhoff, who had worked in various capacities in the textbook selling business before retiring in 2004.  He objected to Johnson's termination for the following reasons: (1) samples were often mailed to each review site within a given school district, rather than delivered by hand; (2) sales representatives preparing to give presentations were able to ask the school district to have a set of the publisher's materials available for the representative's use during the presentation; (3) if items had to be carried into the school, assistance could be requested from the school district's custodial staff; and (4) representatives could carry a single book, rather than a box of books, in order to make a sales presentation.  (Document No. 69, Exhibit 75).

Given this disagreement between the parties, and the evidence presented by each, the Court is convinced that genuine issues of material fact exist as to whether the physically demanding requirements outlined by McGraw-Hill are truly essential functions of a sales representative's job.  In so holding, the Court is guided by the language in *Conneen* which indicates that a distinction must be made between the *requirements* of a given position and the *essential functions* of that position.  *Conneen*, 334 F.3d at 329.  While it is generally McGraw-Hill's prerogative to determine the requirements of its sales representative positions, the issue in this case is whether the requirements in contention fall into the narrower "essential function" category.  *Id.*  In *Conneen*, the Court of Appeals noted that the employee's own experience in the position is relevant to this inquiry.  *Id.* at 326.  In his declaration, Johnson stated that, during the last few years of his employment with McGraw-Hill, he had been able to perform his job without lifting more than ten or fifteen pounds or driving more than forty-five to sixty minutes at a time.  (Document No. 69 at ¶ 16).  He further asserted that he had been able to perform several job-related functions from his home when he was on his 2002 disability leave.  *Id.* at ¶ 32.  While the Court is not convinced that Johnson is entitled to summary judgment, it is nevertheless clear that he has presented a sufficient quantum of evidence with respect to his disability claims to survive McGraw-Hill's competing Motion for Summary Judgment.

Irrespective of the essential function issue, Johnson would be unable to advance his claim under the ADA if he were responsible for any alleged breakdown in the interactive process.

*Conneen*, 334 F.3d at 329.  In *Conneen*, the Court of Appeals concluded that the plaintiff was responsible for the breakdown in the interactive process because she had not informed her employer of the fact that her disabling condition still existed.  *Id.* at 331-332.  This failure to inform occurred under circumstances in which the employer "had every reason to believe that the condition no longer existed" during the period of time in question.  *Id.*  In the instant case, McGraw-Hill cannot rely on a similar theory in order to prevail at the summary judgment stage.  The parties do not dispute that McGraw-Hill was fully aware of Johnson's disabling condition at the time of his termination.  In fact, Bonessi's letter informing Johnson of his termination specifically indicated that, because of his disability, Johnson was unable to perform the essential functions of his job "with or without a reasonable accommodation."  (Document No. 59, Exhibit 49).

While it is clear that Johnson suffered from a disabling condition, and that his employer was aware of this condition, it remains to be determined whether McGraw-Hill made a good faith effort in helping him to obtain the appropriate accommodations.  The record reveals that the parties engaged in discussions about such accommodations.  Nevertheless, Johnson contends that McGraw-Hill did not conduct these discussions in good faith.  Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment at 13.  In support of his position, Johnson points to a January 21, 2005, email message sent by Klages to McGlynn.  In that message, Klages asked whether McGraw-Hill would be able to act on Johnson's termination shortly thereafter, or whether his disability leave would be extended again.  (Document No. 59, Exhibit 38).  Johnson argues that this message suggests that his termination was a foregone conclusion, and that the subsequent discussions were not genuine attempts to accommodate his disability.  While the context of this message does not provide conclusive evidence that McGraw-Hill's subsequent discussions with Johnson were commenced with a particular objective in mind, it does call into question McGraw-Hill's motives for communicating with Johnson during his leave of absence.  Consequently, a reasonable finder of fact could conclude that McGraw-Hill did not conduct the interactive process in good faith.

As McGraw-Hill points out, Johnson's claim is significantly undermined by his alleged unwillingness to consider working in a territory other than Allegheny County.  "If an employee

insists on a single accommodation that is unreasonable as a matter of law, then the employee will be at fault for the breakdown in the interactive process." *Taylor v. Phoenixville School District*, 184 F.3d 296, 316, n. 7 (3d Cir. 1999). The evidence strongly suggests that Johnson persistently argued that he should be assigned to Allegheny County. (Document No. 59, Exhibit 62). Nevertheless, in his letter to McGlynn, which was faxed on May 3, 2005, Johnson repeatedly referred to this request as a "temporary" accommodation. He also indicated that he was open to alternative possibilities. His letter, in pertinent part, stated as follows:

> "Are you not able to note that when I had the Pittsburgh territory, I received awards for outstanding performance and sales and won sales contests? It would seem to me that providing me a temporarily smaller area is an accommodation you would welcome, not reject. In this regard, temporarily I am not able to drive more than thirty to forty-five (30 to 45) miles and thirty (30) minutes, but you should easily be able to accommodate this temporary situation. Are you not able to provide me with temporary accommodations, particularly since I have been a stellar performer in selling textbooks for Macmillan/McGraw-Hill? I would be willing to work in textbook sales with temporary accommodations. If my suggestions may not be to your liking, you should certainly suggest other accommodations."

*Id.* Under certain circumstances, an accommodation that is unreasonable if employed on a permanent basis may nevertheless be deemed reasonable if required only on a temporary basis. *Laurin v. Providence Hospital and Massachusetts Nurses Association*, 150 F.3d 52, 60-61 (1st Cir. 1998). Furthermore, Johnson disputes McGraw-Hill's assertion that he refused to consider servicing areas other than Allegheny County, contending instead that McGraw-Hill declined to discuss this matter at the meeting held on May 10, 2005. Plaintiff's Response to the Defendants' Statement of Undisputed Material Facts in Support of Motion for Summary Judgment at ¶¶ 205-206. In his deposition, Johnson testified that he had asked McGlynn and Bonessi whether they wanted him to relocate, and that they did not answer his question. (Document No. 64, Exhibit 70, at 212).

While it appears that Johnson did not precisely define a particular accommodation request during his participation in the interactive process, it was not necessary for him to do so. In *Armstrong v. Burdette Tomlin Memorial Hospital*, 438 F.3d 240 (3d Cir. 2006), the U.S. Court of Appeals for the Third Circuit determined that a plaintiff need not request a specific

accommodation from his employer in order to establish that he sought reasonable accommodations for his disabling condition.[15]  *Armstrong*, 438 F.3d at 247-248.  To the extent that McGraw-Hill argues that Johnson's request for a transfer to Allegheny County was unreasonable as a matter of law, McGraw-Hill was not relieved of its obligation to seek alternative accommodations.  Given the conflicting assertions made by the parties, it is apparent to the Court that a genuine issue of material fact exists as to who was to blame for the alleged breakdown in the interactive process.

The "essential function" and "interactive process" inquiries would be inconsequential if it were clear that no *reasonable* accommodations could have been made in order to allow Johnson to return to his job.  The U.S. Supreme Court explained the contours of this inquiry in *US Airways, Inc. v. Barnett*, 535 U.S. 391 (2002).  In order to defeat McGraw-Hill's Motion for Summary Judgment, Johnson need only show that "an accommodation seems reasonable on its face, *i.e.*, ordinarily or in the run of cases."  *US Airways, Inc.*, 535 U.S. at 401 (internal quotation marks omitted).  Once a plaintiff makes such a showing, the defendant must come forward with case-specific circumstances that demonstrate undue hardship under 42 U.S.C. § 12112(b)(5)(A).  *Id.* at 402.  As Johnson points out, McGraw-Hill has not specifically alleged that any of his proposed accommodations would cause such an undue hardship, choosing instead to argue that they do not constitute "reasonable accommodations" within the meaning of the statute.  Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment at 9, n. 5.  Therefore, at this stage, the Court need only determine whether Johnson's proposed accommodations seem reasonable on their face, either "ordinarily or in the run of cases."  *US Airways, Inc.*, 535 U.S. at 401.

Although the Supreme Court's decision in *US Airways, Inc.* addressed the rather narrow question of whether the ADA "requires an employer to reassign a disabled employee to a position as a reasonable accommodation even though another employee is entitled to hold the position under the employer's bona fide and established seniority system," the Court of Appeals read the

---

[15]*Armstrong* involved the New Jersey Law Against Discrimination, N.J.S.A. § 10:5-1 *et seq.*, which has been interpreted in accordance with the ADA.  *Armstrong*, 438 F.3d at 246, n. 12.

precedent more broadly in *Shapiro v. Township of Lakewood*, 292 F.3d 356 (3d Cir. 2002).  *US Airways, Inc.*, 535 U.S. at 599.  In *Shapiro*, the Court of Appeals determined that *US Airways, Inc.* applied to a broader category of cases "in which a requested accommodation in the form of a job reassignment is claimed to violate a disability-neutral rule of the employer."[16]  *Shapiro*, 292 F.3d at 361.  If the accommodation proposed by the employee "is not shown to be a type of accommodation that is reasonable in the run of cases, the employee can still prevail by showing that special circumstances warrant a finding that the accommodation is reasonable under the particular circumstances of the case."  *Id.*  For purposes of the instant case, *Shapiro* is relevant to Johnson's request to be transferred to Allegheny County.  It is clear that an accommodation which requires the displacement of another employee would not be reasonable "ordinarily or in the run of cases."  In this case, however, Johnson has called the Court's attention to special circumstances which may warrant a finding that his proposed transfer was reasonable.  First of all, Farr testified that he never wanted to work in Allegheny County, and that he had encouraged McGraw-Hill to assign responsibility for the schools in Allegheny County to Johnson. (Document No. 62, Exhibit 68 at 143).  Secondly, Farr testified that Johnson had particular insight into selling in the Pittsburgh area, and that he was uniquely suited to service that area.  *Id.* at 111-112.  Consequently, it is at least arguable that reassigning Johnson to Allegheny County would not have been as unreasonable as McGraw-Hill contends.

The Court is convinced that a genuine issue of material fact remains as to whether McGraw-Hill had alternatives available to offer Johnson reasonable accommodations for his disability.  In her vocational analysis, Ms. Evans proposes various forms of accommodation for Johnson.  Among other things, they include the use of ergonomic equipment, compact lifting devices, automotive lifts, vehicle cushions, and a flexible work schedule.  (Document No. 69, Exhibit 78).  She also indicates that much of Johnson's work could be performed via the use of

---

[16]Although McGraw-Hill has not articulated a particular disability-neutral rule to defeat Johnson's claim, the Court is convinced that its general method of assigning sales representatives to specific territories qualifies as such.  In *Shapiro*, the disability-neutral rule at issue was an "unwritten practice" under which vacancies for positions were posted on a bulletin board, and employees desiring transfers were expected to apply for any positions that they wanted.  *Shapiro*, 292 F.3d at 360.

his home telephone, thereby alleviating the need for excessive amounts of driving.  Her assertion is supported by Farr's testimony.  In his deposition, Farr testified that Johnson could have relied on a telephone or computer in order to significantly reduce the amount of miles that he needed to drive.  (Document No. 62, Exhibit 68 at 205).  Therefore, it is unclear whether reasonable accommodations designed to reduce Johnson's travel time would have enabled him to continue working as a sales representative.

Twelve days before Bonessi's termination letter was sent to Johnson, McGlynn sent Johnson a letter discussing the issues that needed to be resolved in order to facilitate his return to work.  (Document No. 59, Exhibit 48).  The first concern addressed by McGlynn was the indefinite duration of Johnson's disabling condition.  *Id.*  He correctly noted that Dr. Ackerman was unable to determine how long Johnson's medical restrictions would be present, or whether his condition would improve with treatment.  *Id.*  Secondly, McGlynn indicated that Johnson had been unable to explain how he would perform the "essential functions" of his job.[17]  Thirdly, McGlynn discussed the potential accommodation options that were open for consideration.  *Id.*  These included relocating Johnson to another territory, allowing him to rest between lengthy driving segments, reimbursing him for reasonable lodging and meal expenses if he decided that he needed to reduce his travel time on a particular day, and allowing him to lease a vehicle more accustomed to alleviating his pain.  *Id.*  Finally, McGlynn expressed frustration with Johnson's alleged unwillingness to provide timely responses to McGraw-Hill's inquiries.  *Id.*

With respect to McGlynn's second point, the Court has already determined that a genuine issue of material fact remains as to whether the requirements discussed earlier constitute essential functions of a sales representative's job.  Johnson contends that he could have been assisted by consultants.  In his deposition, he testified that other sales representatives had routinely been given greater access to consultants, and that one consultant had worked distinctly with Farr.  (Document No. 64, Exhibit 70, at 162).  Margaret Wojton testified that she had worked with Farr about 70-75% of the time.  (Document No. 68, Exhibit 74, at 94-95).  This testimony, if believed

---

[17]Among the "essential functions" discussed by McGlynn were the physically demanding requirements discussed earlier.  The ultimate resolution of the nature of these functions, however, will rest with the fact-finder.

by the fact-finder, may lead to the conclusion that McGraw-Hill could have provided Johnson with a consultant without employing an additional person.  Johnson has presented evidence that he had requested assistance from consultants before, and that he had received less consultant assistance than similarly situated sales representatives.  (Document No. 58, Exhibit 26).  In addition, Johnson testified that, at the meeting of May 10, 2005, he had inquired about a vacancy in West Virginia.  (Document No. 64, Exhibit 70, at 212).  He further testified that his inquiry was ignored.  *Id.* at 213.  Bonessi testified that he knew of no specific relocation package that had been offered to Johnson.  (Document No. 62, Exhibit 67, at 182-185).  Under certain circumstances, "reassignment to a vacant position" can be considered a reasonable accommodation under the ADA.  *Taylor*, 184 F.3d at 319.  Furthermore, Johnson need not demonstrate that he formally applied for the West Virginia position.  *Shapiro*, 292 F.3d at 360-361.  He need only show that such a position existed, and he has clearly done so in this case.  (Document No. 59, Exhibit 55).  A reasonable fact-finder could conclude that McGraw-Hill was not looking to accommodate Johnson but was, instead, seeking to terminate him.

Earlier this year, the U.S. Court of Appeals for the Third Circuit explained that, where a genuine factual dispute exists as to whether reasonable accommodations were available, a jury must determine whether the employer "engaged in a good faith effort to find a reasonable accommodation."  *Armstrong*, 438 F.3d at 247.  The issue of "reasonable accommodation" also presents a question of fact for the jury.  *Turner*, 440 F.3d at 614.  "The ADA does not require an employer to create a new position in order to accommodate an employee with a disability, or transform a temporary light duty position into a permanent position."  *Id.*  McGraw-Hill is free to argue at trial that it was not responsible for the breakdown in the interactive process, and that Johnson failed to make a good faith effort to explain how he would be able to perform the essential functions of his job.  In the event that the jury determines that McGraw-Hill was responsible for the breakdown in the interactive process, McGraw-Hill remains free to argue that no *reasonable* accommodation would have allowed Johnson to perform the essential functions of his job.[18]  *Taylor*, 184 F.3d at 320.  Furthermore, McGraw-Hill will have the opportunity at trial

---

[18]Since the Court concludes that a genuine issue of material fact exists as to whether the job requirements identified by McGraw-Hill are "essential functions" of a sales representative's

to defeat Johnson's proposed accommodations on the ground that they would impose an "undue hardship" on McGraw-Hill for purposes of 42 U.S.C. § 12112(b)(5)(A), even if they are otherwise deemed "reasonable" under the statute.  *Turner*, 440 F.3d at 615.[19]

Accordingly, the Court must deny Johnson's Motion for Partial Summary Judgment *(Document No. 55)* in its entirety and McGraw-Hill's Motion for Summary Judgment *(Document No. 52)* with respect to Counts III and IX, and with respect to Counts VII and XI to the extent that they are based on allegations of discrimination on the basis of disability.

D.     Retaliation

Counts IV, V and VI of Johnson's Second Amended Complaint allege that McGraw-Hill violated the anti-retaliation provisions of the ADEA, Title VII and the ADA.  Second Amended Complaint at ¶¶ 148-154.  Count X alleges that Johnson was terminated in retaliation for seeking accommodations under the ADA.  *Id.* at ¶164.  Count XI alleges a corresponding violation of the PHRA.  *Id.* at ¶175.

Very recently, the U.S. Supreme Court addressed the issue of retaliation under Title VII.[20]

_____

job, Johnson's acknowledgment that he cannot perform those functions does not estop him from arguing that he is "otherwise qualified" to be a sales representative.  (Document No. 97, at 4).

[19]The Court notes that McGraw-Hill has not argued that any specific accommodation would cause it to suffer an "undue hardship," relying instead on its argument that the accommodations proposed by Johnson are not "reasonable" for purposes of the ADA.  Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment at 9, n. 5.  As the Supreme Court explained in *US Airways, Inc.*, these two statutory terms do not mean the same thing.  *US Airways, Inc.*, 535 U.S. at 401-402.  Since McGraw-Hill has not specifically raised the "undue hardship" issue at this stage, the Court's inquiry is limited to the question of whether Johnson's proposed accommodations seem reasonable "ordinarily or in the run of cases" and, if not, whether special circumstances warrant a finding that the requested accommodations are reasonable within the context of this particular case.  *US Airways, Inc.*, 535 U.S. at 401-402, 405-406.

[20]Title VII's anti-retaliation provision states as follows: "It shall an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this title [42 U.S.C. §§ 2000e-2000e17], or because he has

In *Burlington Northern & Sante Fe Railway Co. v. White*, 126 S.Ct. 2405 (2006), the Court held that "the anti-retaliation provision does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace." *Burlington Northern*, 126 S.Ct. at 2409. In order to advance a Title VII retaliation claim, a plaintiff must demonstrate that the alleged retaliatory action "would have been materially adverse to a reasonable employee or job applicant." *Id.* This standard is designed to "screen out trivial conduct while effectively capturing those acts that are likely to dissuade employees from complaining or assisting in complaints about discrimination." *Id.* at 2416.

At the outset, it is worth noting that the anti-retaliation provisions of the ADEA and the ADA are not materially different from that contained in Title VII.[21] Consequently, the Court will apply the *Burlington Northern* standard to each of Johnson's retaliation claims. In *Burlington Northern*, the Court construed the words "discriminate against" to prohibit a broad category of actions by an employer. *Id.* at 2411. Title VII's anti-retaliation provision does not merely prohibit an employer from discriminating against an individual "with respect to his compensation, terms, conditions, or privileges of employment," but instead sweeps broadly enough to prohibit other "materially adverse" actions taken in retaliation for activity protected under the statute. *Id.* at 2411, 2415. The dispositive question is whether a particular action would deter an objectively reasonable employee from seeking legal recourse. The Court noted

_____

made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title [42 U.S.C. §§ 2000e-2000e-17]." 42 U.S.C. § 2000e-3(a).

[21]The ADEA's anti-retaliation provision states as follows: "It shall be unlawful for an employer to discriminate against any of his employees or applicants for employment, for an employment agency to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because such individual, member or applicant for membership has opposed any practice made unlawful by this section, or because such individual, member or applicant for membership has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this Act." 29 U.S.C. § 623(d).

The ADA's anti-retaliation provision states as follows: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this Act or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this Act." 42 U.S.C. § 12203(a).

34

that "petty slights, minor annoyances, and simple lack of good manners will not create such deterrence." *Id.* at 2415.

As McGraw-Hill points out, Johnson's retaliation Counts VI, V and VI do not allege conduct separate and distinct from the alleged conduct supporting the underlying allegations of discrimination. Defendants' Brief in Support of Motion for Summary Judgment at 24-25. It is, of course, possible that an action taken in retaliation for the filing of a complaint with the EEOC could simultaneously constitute an additional violation of the underlying statute. Nevertheless, Johnson has failed to demonstrate that any of the allegedly discriminatory actions by McGraw-Hill were taken in response to his exercise of legal rights. The substantive provisions of Title VII, the ADEA and the ADA seek to prevent injury to individuals based on who they are, while the anti-retaliation provisions seek to prevent harm to individuals based on what they do. *Burlington Northern*, 126 S.Ct. at 2412. In order to proceed on a retaliation claim, Johnson must provide evidence of a causal link between his engagement in protected activity and particular retaliatory actions taken against him by his employer. While it is not necessary for Johnson to establish that he was actually dissuaded from seeking legal recourse (which he obviously was not), he must establish that he was subjected to a materially adverse act of retaliation that might "well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* at 2409. Johnson's generic retaliation claims, which allege nothing distinct from the underlying charges of discrimination, are not supported by sufficient evidence to allow a reasonable fact-finder to conclude that he was subjected to materially adverse acts of retaliation. For this reason, the Court must grant McGraw-Hill's Motion for Summary Judgment *(Document No. 52)* with respect to Counts IV, V and VI.

In holding that Johnson has failed to establish a *prima facie* case of retaliation with respect to Counts IV, V and VI, the Court does not hold that the same conduct cannot support both an underlying charge of discrimination and a distinct charge of retaliation. If, for instance, Johnson's retaliation claims were supported by evidence enabling a reasonable fact-finder to conclude that he was discriminated against *as a result of his actions against his employer*, his claims could proceed to trial under both the ADA's substantive provisions and its retaliation provision. In this case, however, Johnson does nothing more than repeat his underlying charges

of discrimination under a "retaliation" heading.  Second Amended Complaint at ¶¶ 148-154.
That is insufficient to sustain a retaliation claim, which seeks to protect an employee's *conduct*
rather than his *status*.  *Burlington Northern*, 126 S.Ct. at 2412.

Counts X and XI of Plaintiff's Complaint are different from Counts IV, V and VI in that
they allege a specific retaliatory act.  In Count X, Johnson alleges that he was terminated in
retaliation for his attempts to obtain reasonable accommodations.  A similar allegation is made in
Count XI pursuant to the PHRA.  Second Amended Complaint at ¶ 164.  In order to establish a
*prima facie* case of retaliation, a plaintiff must show that: (1) he engaged in a protected employee
activity; (2) his employer took a materially adverse action[22] after or contemporaneous with his
protected activity; and (3) a causal link exists between his protected activity and the employer's
adverse action.  *Farrell v. Planters Lifesavers Company*, 206 F.3d 271, 279 (3d Cir. 2000).  The
parties do not dispute that Johnson engaged in protected employee activity.  Secondly, it is clear
that a retaliatory discharge on the part of an employer would constitute a "materially adverse" act
of retaliation under *Burlington Northern*.  The only question that remains is whether Johnson has
established a causal link between his protected activity and McGraw-Hill's decision to terminate
his employment.

In *Farrell v. Planters Lifesavers Company*, 206 F.3d 271 (3d Cir. 2000), the U.S. Court
of Appeals for the Third Circuit explained that "the type of evidence that can be considered
probative of the causal link" is "not limited to timing and demonstrative proof, such as actual
antagonistic conduct or animus."  *Farrell*, 206 F.3d at 281.  "[I]t can be other evidence gleaned
from the record as a whole from which causation can be inferred."  *Id.*  As noted earlier, Johnson
has provided sufficient evidence to enable a reasonable fact-finder to conclude that McGraw-
Hill's decision to terminate him was made before the latter stages of the interactive process.  That
same evidence can support his retaliatory discharge claim.  In a January 21, 2005, email to
McGlynn, Klages relayed the contents of her conversation with Johnson.  (Document No. 59,

---

[22]In *Farrell*, the Court of Appeals used the term "adverse employment action" when it
described the second element.  *Farrell*, 206 F.3d at 279.  In light of *Burlington Northern*,
however, it is clear that the term "materially adverse action" should be used instead.  *Burlington
Northern*, 126 S.Ct. at 2415.

Exhibit 38).  In that conversation, Johnson apparently told Klages that he could return to work immediately if he were given a territory in which he would not have to drive for more than an hour or lift boxes.  *Id.*  According to Klages' email, Johnson also told her that if he had to drive for over three hours and continue to lift boxes, he was unsure as to when he would be able to return to work.  *Id.*  It was in that same email that Klages asked McGlynn whether McGraw-Hill would be able to act on Johnson's termination.  *Id.*  While Klages may have made this inquiry solely because she assumed that Johnson was simply unable to work, a reasonable fact-finder could infer that she was retaliating against him for requesting accommodations.[23]  For this reason, McGraw-Hill's Motion for Summary Judgment *(Document No. 52)* must be denied with respect to Count X, and with respect to Count XI to the extent that it is based on Johnson's retaliatory discharge claim.  Nevertheless, at trial, Johnson cannot prevail on this claim solely by demonstrating that McGraw-Hill failed to make reasonable accommodations for his disability. Instead, he will need to show that he was terminated precisely because he sought such accommodations, rather than because McGraw-Hill did not want to accommodate him. *Burlington Northern*, 126 S.Ct. at 2412.

     E.    <u>Conversion</u>

In Count XII of his Second Amended Complaint, Johnson alleges that McGraw-Hill converted his cellular telephone for its own use.  Second Amended Complaint at ¶ 177.  In *Shonberger v. Oswell*, 530 A.2d 112 (Pa.Super. 1987), the Pennsylvania Superior Court described conversion as "the deprivation of another's right of property in, or use or possession of, a chattel, without the owner's consent and without lawful justification."  *Shonberger*, 530 A.2d at 484.  "[A]n intent to exercise dominion or control over the goods which is in fact inconsistent with the plaintiff's rights establishes the tort."  *Id.* at 485.

It is undisputed that Johnson never lost physical possession of the telephone.  Defendants'

---

[23]Johnson's Second Amended Complaint does not specify whether the retaliation claim asserted in Count X is based on 42 U.S.C. § 12203(a) or 42 U.S.C. § 12203(b).  Section 12203(b) states as follows: "It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise of enjoyment of, any right granted or protected by this Act."

Statement of Undisputed Material Facts in Support of Motion for Summary Judgment at ¶ 241. Instead, he alleges that McGraw-Hill constructively converted it.  In his deposition, Johnson testified that, when Klages became the District Manager, she told him to put "a dictated and in-print message" on his answering machine.  (Document No. 64, Exhibit 79, at 233).  He put it on his cellular phone as well.  *Id.*  Apparently, his access to McGraw-Hill's plan was terminated when he went on leave in October, 2004.  *Id.* at 234-235.  The phone ceased to work after the plan was taken away.  *Id.* at 235.  According to Johnson, he was told by Verizon that the phone could no longer be used because it did not contain a GPS locator.  *Id.*  Notwithstanding any inconvenience experienced by Johnson as a result of this transition, he makes no effort to explain why McGraw-Hill is responsible for the fact that his cellular phone was obsolete.  Accordingly, his conversion claim must fail, and the Court will grant McGraw-Hill's Motion for Summary Judgment *(Document No. 52)* with respect to Count XII of Johnson's Second Amended Complaint.

Conclusion

For the reasons hereinabove stated, the Court will deny Johnson's Motion for Partial Summary Judgment *(Document No. 55)*, grant McGraw-Hill's Motion for Summary Judgment *(Document No. 52)* with respect to Counts I, II, IV, V, VI, VIII and XII, and with respect to Counts VII and XI insofar as they allege discrimination on the basis of age or gender.  McGraw-Hill's Motion for Summary Judgment will be granted with respect to Counts III, VII, IX, X and XI to the extent that those counts are based on conduct alleged to have occurred before January 9, 2002.  McGraw-Hill's Motion for Summary Judgment will be denied with respect to Counts III, VII, IX, X and XI only insofar as they are based on allegations of disability discrimination immediately preceding, and concurrent with, Johnson's 2004 leave of absence, and his subsequent termination.  An appropriate Order follows.

McVerry, J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **RICHARD M. JOHNSON,** | ) |
| | ) |
| **Plaintiff,** | ) |
| **v.** | ) |
| | ) |
| **THE MCGRAW-HILL COMPANIES,** | )    **2:03cv889** |
| **MACMILLAN/MCGRAW-HILL,** | ) |
| **MCGRAW-HILL SCHOOL DIVISION,** | ) |
| **SUCCESSORS and ASSIGNS,** | ) |
| | ) |
| **Defendants.** | ) |

## ORDER OF COURT

AND NOW, this 5th day of September, 2006, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED and DECREED** that Plaintiff's Motion for Partial Summary Judgment *(Document No. 55)* is **DENIED**, that Defendant's Motion for Summary Judgment *(Document No. 52)* is **GRANTED** as to Counts I, II, IV, V, VI, VIII and XII, and that Defendant's Motion for Summary Judgment is **GRANTED IN PART and DENIED IN PART** as to Counts III, VII, IX, X and XI.

BY THE COURT:

s/  Terrence F. McVerry
United States District Court Judge

cc:     James B. Lieber, Esquire
        Email: lhlawfirm@aol.com
        Thomas M. Huber, Esquire
        Email: thuber@choiceonemail.com
        James A. Prozzi, Esquire
        Email: prozzij@jacksonlewis.com
        Mark Goldner, Esquire
        Email: goldnerm@jacksonlewis.com
        Richard S. McAtee, Esquire
        Email: mcateer@jacksonlewis.com